381 P.2d 57

**Joy Jean BURKS and Seldon E. Burks, her husband, Plaintiffs-Appellants,**

**v.**

**M. R. BAUMGARTNER, Defendant-Appellee.**

**No. 7175.**

Supreme Court of New Mexico.

March 28, 1963.

Rehearing Denied May 14, 1963.

Albert J. Rivera, Alamogordo, Smith, Kiker & Kitts, Albuquerque, for appellants.

Shipley, Seller & Whorton, Alamogordo, for appellee.

CHAVEZ, Justice.

This is an appeal from a judgment of the trial court dismissing appellants' second cause of action, upon motion of appellee made after both parties had concluded their evidence and rested. Appellants sought recovery for medical malpractice in that appellee performed a hysterectomy upon appellant, Joy Jean Burks, hereinafter referred to as "appellant," while appellant, without her knowledge, was pregnant; that appellee failed to diagnose such pregnancy prior to his performance of such surgery; and that the surgery caused appellant to suffer an abortion. The damages alleged in the second cause of action are for mental anguish, distress and anxiety. ·

Appellants rely solely upon two points for a reversal:

"2. The court èrred in withdrawing plaintiffs' second cause of action from the consideration of the jury for the reason that substantial evidence was adduced during the trial of this cause which would have warranted a verdict in favor of plaintiffs upon the said cause of action.

"3. The trial court erred in entering judgment upon the said second cause of action dismissing it with prejudice, for the reason that the said cause of action was supported by substantial evidence adduced during the course of the trial of this case, which would have warranted the jury in returning a verdict thereon in favor of plaintiffs."

Thus, the questions before us are whether appellants adduced substantial evidence to show that appellant was pregnant at the time of the surgery performed upon her by appellee; and, that if appellant was pregnant, appellee was negligent in failing to diagnose such pregnancy prior to such surgery.

The record of the evidence submitted in this case is voluminous; however, a fair summary of said evidence follows.

Dr. M. S. Hart, a specialist in pathology from El Paso, Texas, and a member of the American, Texas and El Paso County Medical Associations, the American Society of Clinical Pathologists, the College of American Pathologists, the International Academy of Pathology and a Diplomate of the American Board of Pathology, testified that on April 29, 1960, he made a pathological examination of the tissue consisting of the uterus, right tube, ovaries and appendix taken from appellant; that the tissue was. submitted from Champion Memorial Hospi-,

tal, Alamogordo, New Mexico, under the name of Dr. M. R. Baumgartner; that the examination of the tissue was made first from a gross examination, that is, a general description of the tissue submitted, and then the various areas were removed or sectioned and processed, stained and examined under the microscope; that the gross examination showed a uterus, fallopian tube, ovary and an appendix; that the uterus was found to be enlarged and measured 120 by 85 millimeters (approximately 6″ by 4½″); that the average size of a uterus of an adult female who is not pregnant would be approximately 4″ by 2½″; that the uterus was intact and it was not cut open; that the other gross finding was a cyst in the ovary that was designated as a gluteal cyst, called a corpus luteum, which is normally present at each month in the female, but associated with pregnancy becomes larger than under normal circumstances; that the microscopic study of the uterus revealed an adenomyosis, which means a diseased uterus, in that there are islands or areas of the lining of the uterus that are embedded or present within the muscle of the uterus; that there was an inflammation of the cervix, which is the mouth of the womb, and there was present microscopic evidence of a reaction of pregnancy; that microscopic evidence reveals certain changes in the lining of the uterus in the event of pregnancy and are manifested by a swelling of the cells, a change in the glandular pattern and the presence of placental tissue. Dr. Hart testified:

"Q. And, you found that it [the uterus] had not been cut open in any respect before it was delivered to you?

"A. According to my record it was intact. If it has been opened we include it in our report that the specimen has previously been opened, and that is not in my report.

"Q. Do you have any independent recollection of whether the, aside from your report or your records as to whether the cavity has been opened?

"A. No, I do not."

Based upon his gross and microscopic study, after examining the tissue on April 29, 1960, Dr. Hart testified that his diagnosis was:

"A. First, reaction of pregnancy with a statement that it was approximately twelve weeks gestation. Number two, adenomyosis, inflammation of the cervix, a corpus luteum cyst of the ovary, fallopian tube with no abnormal changes and an appendix with no abnormal changes.

"Q. Based upon those findings, Doctor, can you express an opinion as to whether or not the patient from

whom this tissue was removed was pregnant prior to this operation, the result of the removing of the tissue?

"A. No, the diagnosis was a reaction to pregnancy.

"Q. And would you tell us what that indicates?

"A. That indicates that she either was or had been pregnant.

"Q. And is there any way of fixing the limitation of time during which this pregnancy existed?

"A. Yes. We estimate that from the size of the uterus, the age of the cyst of the ovary on gross examination and on microscopic examination the presence of these changes in the lining of the womb that are characteristic in pregnancy, along with placental tissue. In this instance we did not demonstrate grossly nor microscopic hypetus.

"Q. Were you able from your examination of the tissue to reach any estimate as to when the pregnancy terminated?

"A. I could only make an approximation. In absence of any inflammatory reaction it would be difficult to place the termination of the pregnancy, assuming that there was a termination and that the fetus had been lost within several days.

"Q. What would your estimation be in that regard?

"A. In the absence of any description in my report of necrotic or dead tissue and in the absence of old hemorrhage I would estimate that the termination could have been anywhere from twenty-four hours to five or six days.

\*       \*       \*       \*       \*       \*

"Q. \* \* \* And did you find any evidence of necrotic tissue or old blood?

"A. We did not."

On cross-examination, Dr. Hart testified that the enlargement of the uterus was caused by two factors, a diseased uterus and a reaction of pregnancy; that the uterus was approximately two times average size and was symmetrical. Dr. Hart defined the word "fetus" as the product of conception that results in a human life being implanted in the lining of the womb, the child in the formative stages. He further testified that the term "reaction of pregnancy" is the qualified term apart from the normal term "pregnancy," implying a fetus in a uterus. Dr. Hart was asked to explain the term "corpus luteum of pregnancy" and answered:

"A. The presence of this cyst on the ovary from which the ova came.

Normally in the absence of pregnancy is relatively small and the wall is think [sic]. Grossly and on microscopic examination the cells have a different character. In other words, once we have opened this cyst on our gross examination we may be suspicious of pregnancy and once we have examined it under the miscroscope we can be quite certain that it is a corpus luteum of pregnancy and not a simple cyst that has filled up with blood."

In direct conflict with the testimony of Dr. Hart, that the uterus was intact, is the testimony of appellee and a nurse, Ruby Mirabal, who testified that appellee opened the uterus following the surgery and that it contained no fetus. Another nurse, Mrs. John Lenzo, testified as to appellee's usual procedure in surgery cases, including the removal of any organ from the body, but could not remember this particular case because "it was so common."

Dr. Gerald H. Jordan, a general surgeon and gynecologist, testified that appellant came to him on February 19, 1960, complaining of periodic cramping a week before her period with clots and a bright red discharge, low back ache, occasionally had dyspareunia and had severe pain with her last period in the right lower quadrant. Dr. Jordan did a "suction-curettage" in which the cervix is very slightly dilated and a small instrument is inserted, removing tissue primarily for study. Such tissue was submitted to Hart, Boverie, Green, Black, Clayton and White Laboratory for analysis. He recommended the removal of the uterus, i. e., that appellant have a hysterectomy. Asked if he would say that the finding made by the pathologist, Dr. Hart, would indicate that appellant was pregnant at the time of surgery, he answered:

"A. Well, of course, if the uterus wasn't opened you would expect to find the embryo intact. The finding of placental tissue. I don't think would mean anything. The corpus luteum of pregnancy I don't think would mean that she was pregnant at the time she was operated on. I mean she could have been pregnant on the border of a day or *say* [sic] before or two days before.

\* \* \* \* \* \*

"Q. So would it be your opinion, Doctor, that those pathological findings would indicate that this woman was pregnant in the general vicinity of the time of this operation?

"A. I think you would have presumed that she had been pregnant some time in the general vicinity of the time of surgery, yes."

There is also evidence in the record pertaining to the time of termination of ap-

pellant's pregnancy. Dr. Hart testified that, in his opinion, the fetus could have been expelled not longer than six to eight or nine days prior to the surgery. There is also evidence in the record that there was no fetus or indication thereof present at the time the pathological work was performed. Dr. Hart also testified that there was evidence of placental tissue, which indicates that there was initiated the products of conception that resulted in the formation of placenta in the uterus cavity. There is evidence of the hypothesis that the fetus had died, which was negatived by the absence of necrotic tissue which would have formed not less than twenty-four hours, nor more than six or seven days after its death. There is also evidence that appellant did not want any more children and had been practicing contraception.

Appellant was asked if, at the time she was examined by appellee on April 19, 1960, anything was said about whether she was pregnant or might be pregnant, or whether she thought she was pregnant, and replied:

"A. I did not think I was pregnant. I had none of the symptoms I am familiar with as being pregnant. I have two children and didn't have the same type of symptoms that I had when I carried those two children."

Appellant was then asked if she had informed Dr. Jordan, on February 19, 1960, after learning of her condition, whether she planned to have more children and she replied:

"A. He asked me, 'Do you want more family?' And, I said, 'No not at the present time, I don't, I have two boys and I didn't plan on any at that time.' And, he said, 'Well, there was a treatment for this, but it was very expensive.' And, he said it doesn't always work, but he said there was a treatment for it, if you did plan to have more, and he left it up to me as far as—"

Appellant contends that there is sufficient evidence to support her contentions that appellee was negligent in not causing a laboratory frog test to be performed; that assuming that a frog test was performed, appellee was nevertheless negligent in relying upon a purported negative frog test reported less than twenty-four hours after injection of the frog; and assuming that a proper frog test was performed, still the jury would have been warranted in finding appellee negligent in failing to diagnose appellant's pregnancy, in view of the clinical symptoms thereof that were present. Appellee says the contention, that no frog test was performed, is untrue. Appellants' Ex. 1, p. 7, asserts: "Remarks: Frog test —Negative."

Appellant testified that she was given a slip of paper to take to the laboratory and that nothing was said on said slip about a frog test. Appellee testified that he had given appellant a slip ordering a frog test.

Lu Ainsworth, a laboratory technician, testified with reference to the laboratory report, appellants' Ex. 1, p. 7, as follows:

"Q. First 'one, Blood Morphology and Frog Test negative, can you tell us if your handwriting, excluding the initials, whether your handwriting appears on the slip?

(Examined by the Witness.)

"A. No, I did not write the patient's name or doctor or 'Frog Test negative'.

"Q. Now, does that initial look to you like your initials?

"A. As I said this morning, I am a scrawler and it could be, I will not swear that it isn't.

"Q. And, how do they look to you, did they look like them or not?

"A. No, it doesn't."

Mrs. Ainsworth further testified:

"Q. Mrs. Ainsworth, do you have any recollection of having performed a Frog Test for Mrs. Burks?

"A. No, I don't."

On recross examination, Mrs. Ainsworth testified:

"A. I say I don't or wouldn't remember whether I performed it or not, a lot of people come in a laboratory in a day and that was a year and a half ago, I can't remember that far back, I am afraid."

There is also testimony that the laboratory log book (appellants' Ex. 2) showed that no frog test had been performed on appellant and that she was not charged for any frog test. This exhibit also shows that the only laboratory test done on appellant, on the day in question, was routine work required on all presurgical patients. This line of testimony bears upon the question of whether or not sufficient evidence was presented on behalf of appellants that the purported frog test result, as set out in the hospital record, was fabricated.

Appellants argue that if the purported negative frog test report slip, purportedly signed by "Lu," was genuine and was in the hospital chart (appellants' Ex. 1, p. 7), why did Dr. Hosford write a report of consultation, undated and without examining appellant, which report became page 8 of said exhibit, and stated in part:

" * * * pt. referred to gynecologist El Paso where neg frog test obtained and D & C performed * * *."

Appellants contend that the purported frog test was not genuine, as it lacked any data or details of any type concerning such test.

Dr. Hart testified that a frog test report coming from his laboratory would contain considerably more information than appears on the report slip in question.

Appellants further contend that, even assuming that a frog test was performed, the evidence establishes that appellee was negligent in relying upon a frog test result reported less than twenty-four hours after the injection of the frog. Appellee testified that he knew on the same day the frog test was purportedly performed that it was negative, and that he relied upon the negative result reported that same day. Whereas, Dr. Hart testified that it would be necessary, before reaching a determination that the reaction of the frog is negative, to wait for a period of twenty-four hours after the cerium or urine is injected into the frog, and that this would be the standard period required.

There is evidence in appellants' Ex. 1, p, 1, a notation on the hospital chart, examined, approved and evidently signed by appellee, as follows: "abortion incomplete," which term appellee explained to be an "interruption of pregnancy."

In a jury case such as this, where a motion to dismiss is made by the defendant at the conclusion of the case and after both sides have presented their evidence and rested, or on a motion to direct a verdict on an issue in the case, the rule is well established that we must view the evidence in the light most favorable to plaintiff, in-

dulging in his favor every reasonable inference that may be drawn therefrom. If reasonable minds may differ, it is a proper question to be submitted to the jury; otherwise, it should be withdrawn. Stranczek v. Burch, 67 N.M. 237, 354 P.2d 531; Bryan v. Phillips, 70 N.M. 1, 369 P.2d 37. Thus, under the evidence in this case, the minds of reasonable men may differ, and hence we hold that there is sufficient evidence from which the jury might find that appellant was pregnant at the time that the operation was performed, and that the learned trial court committed error in dismissing appellants' second cause of action.

Since this case requires a retrial, it becomes necessary to comment on the trial court's ruling excluding portions of the testimony, by deposition, of Admiral Joseph William Kimbrough, a medical doctor. The trial court sustained appellee's objections to the questions and answers marked and appearing in the transcript, pages 378–379, also questions and answers appearing on pages 366–367, and the answer made by this witness appearing on page 422. The above testimony is pertinent because the trial court, in the judgment, held that "there is no just reason for delay in entering a final judgment dismissing the plaintiffs' second cause of action * * *."

It may be that the questions appearing in the transcript, pages 378–379, failed to include material facts necessary for the expert witness to form an opinion, and that

the trial court's ruling was correct. The trial court may have been correct in striking the other portions of Kimbrough's testimony, but this we need not decide because, upon retrial, according to appellants' statements, they will submit other evidence in support of their second cause of action. Thus, at the retrial of this case, when evidence is offered tending to establish appellants' second cause of action, the trial court will rule upon its admissibility.

The cause is reversed and remanded to the district court with direction to vacate the judgment dismissing appellants' second cause of action, to reinstate said cause on the trial docket, and proceed in a manner not inconsistent with this opinion.

It is so ordered.

COMPTON, C. J., and CARMODY, J., concur.